1 | ROBBINS GELLER RUDMAN
   & DOWD LLP
2 | SHAWN A. WILLIAMS (213113)
Post Montgomery Center
3 | One Montgomery Street, Suite 1800
San Francisco, CA  94104
4 | Telephone:  415/288-4545
415/288-4534 (fax)
5 | shawnw@rgrdlaw.com
        – and –
6 | DAVID C. WALTON (167268)
655 West Broadway, Suite 1900
7 | San Diego, CA  92101-8498
Telephone:  619/231-1058
8 | 619/231-7423 (fax)
davew@rgrdlaw.com
9 |
Attorneys for Plaintiff
10 |
[Additional counsel appear on signature page.]
11 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| JOSHUA HORWITZ, Individually and on Behalf of All Others Similarly Situated, | ) | Case No. |
|---|---|---|
| | ) | |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | COMPLAINT FOR VIOLATION OF THE |
| vs. | ) | FEDERAL SECURITIES LAWS |
| | ) | |
| TESLA, INC. and ELON R. MUSK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

1    Plaintiff Joshua Horwitz, individually and on behalf of all others similarly situated, by

2 plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following

3 based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and

4 belief as to all other matters based on the investigation conducted by and through plaintiff's

5 attorneys, which included, among other things, a review of U.S. Securities and Exchange

6 Commission ("SEC") filings by Tesla, Inc. ("Tesla" or the "Company"), public statements on social

7 media and media reports about the Company.   Plaintiff believes that substantial additional

8 evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

9 discovery.

10                                   **NATURE OF THE ACTION**

11    1.    This is a securities fraud class action on behalf of all purchasers of Tesla securities

12 between August 7, 2018 and August 17, 2018, inclusive (the "Class Period"), seeking to pursue

13 remedies under the Securities Exchange Act of 1934 ("1934 Act").   These claims are asserted

14 against Tesla and its Chairman and Chief Executive Officer ("CEO"), Elon R. Musk ("Musk"), who

15 made materially false and misleading public statements during the Class Period.

16    2.    Tesla designs, develops, manufactures and sells electric vehicles and energy

17 generation and storage systems in the United States, China, Norway and internationally.

18    3.    On August 7, 2018, defendant Musk, co-founder, CEO and Chairman of the Board of

19 Tesla, issued a tweet on Twitter.com ("Twitter") that stated: "Am considering taking Tesla private at

20 $420.  Funding secured."

21    4.    Later that day, Musk issued another tweet stating: "Investor support is confirmed.

22 Only reason why this is not certain is that it's contingent on a shareholder vote."

23    5.    As a result, Tesla's stock price rapidly increased, reaching an intra-day high of

24 $387.46 per share, $45.47 per share higher than the previous day's closing price, before closing at

25 $379.57 per share on August 7, 2018, a one-day increase of $37.58 per share.

26    6.    On August 8, 2018, it was announced that the SEC was making inquiries regarding

27 the veracity of the tweets sent by Musk and the reason the disclosures were made via a social media

28 posting rather than a filing with the SEC.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 1 -

1     7.     As a result of this news, Tesla's stock price declined $9.23 per share to close at

2  $370.34 per share on August 8, 2018.

3     8.     On August 13, 2018, Musk tweeted: "I'm excited to work with Silver Lake and

4  Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles &

5  Olson as legal advisors, on the proposal to take Tesla private."

6     9.     On August 14, 2018, *Bloomberg* reported that Goldman Sachs and Silver Lake had

7  not officially signed on when Musk issued his tweet on August 13, 2018.

8     10.     Then on August 17, 2018, *The New York Times* published an interview with Musk in

9  which he described the circumstances leading up to the tweet, including his high stress levels and his

10  use of Ambien to cope with the stress.  On this news, the price of Tesla stock declined $29.95 per

11  share to close at $305.50 per share on August 17, 2018.

12     11.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class (as

13  defined below) purchased Tesla securities at artificially inflated prices, suffering significant losses,

14  and were damaged thereby.

15                                        **JURISDICTION AND VENUE**

16     12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934

17  Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder

18  by the SEC.

19     13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

20  §1331 and §27 of the 1934 Act.

21     14.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C.

22  §1391(b).   Many of the acts charged herein, including the preparation and dissemination of

23  materially false and misleading information, occurred in substantial part in this District.

24     15.     In connection with the acts alleged in this complaint, defendants, directly or

25  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

26  the mails, interstate telephone communications and the facilities of the national securities exchange.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 2 -

1

**PARTIES**

2      16.     Plaintiff Joshua Horwitz, as set forth in the accompanying certification, purchased

3   Tesla securities during the Class Period and was damaged thereby.

4      17.     Defendant Tesla is incorporated in Delaware.  The Company's principal executive

5   offices are located at 3500 Deer Creek Road, Palo Alto, California 94304.  Tesla's shares trade on

6   the NASDAQ under the ticker symbol "TSLA."

7      18.     Defendant Elon R. Musk is, and has been at all relevant times, CEO and Chairman of

8   the Board of Tesla.

9

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

10      19.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose

11   adverse facts known to them about Tesla.  Defendants' fraudulent scheme and course of business

12   that operated as a fraud or deceit on purchasers of Tesla securities was a success, as it: (i) deceived

13   the investing public regarding Tesla's prospects and business; (ii) artificially inflated the prices of

14   Tesla securities; and (iii) caused plaintiff and other members of the Class to purchase Tesla securities

15   at artificially inflated prices.

16

**DEFENDANTS' SCIENTER**

17      20.     During the Class Period, defendant Musk had the motive and opportunity to commit

18   the alleged fraud.  Defendant Musk also had actual knowledge of the misleading statements he made

19   and/or acted in reckless disregard of the truth at the time.  In doing so, Musk engaged in a scheme to

20   defraud and committed acts and practices and participated in a course of business that operated as a

21   fraud or deceit on purchasers of Tesla securities during the Class Period.

22

**BACKGROUND**

23      21.     Tesla designs, develops, manufactures and sells high-performance fully electric

24   vehicles and energy generation and storage systems, and also installs and maintains such systems

25   and sells solar electricity.  Founded in 2003, the Company was formerly known as Tesla Motors, Inc.

26   and changed its name to Tesla in February 2017.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 3 -

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

22.    On August 7, 2018, defendant Musk issued a tweet on Twitter that stated: "Am considering taking Tesla private at $420.  Funding secured."

23.    Musk issued another tweet the same day that stated: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

24.    Subsequently on August 7, 2018, Tesla posted on its corporate blog an e-mail from defendant Musk to the Company's employees, which stated:

Taking Tesla Private
August 7, 2018

*The following email was sent to Tesla employees toda*y:

Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share.  I wanted to let you know my rationale for this, and why I think this is the best path forward.

First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best.  As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders.  Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term.  Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

*          *          *

Here's what I envision being private would mean for all shareholders, including all of our employees.

First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%).  My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX.  If we were to go private, employees would still be able to periodically sell their shares and exercise their options.  This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla.  They would continue to have separate ownership and governance structures.  However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 4 -

1    shareholders and employee shareholders have an opportunity to sell or buy
     approximately every six months.

2

3            Finally, this has nothing to do with accumulating control for myself.  I own
     about 20% of the company now, and I don't envision that being substantially
     different after any deal is completed.

4

5            Basically, I'm trying to accomplish an outcome where Tesla can operate at its
     best, free from as much distraction and short-term thinking as possible, and where
     there is as little change for all of our investors, including all of our employees, as

6    possible.

7            This proposal to go private would ultimately be finalized through a vote of
     our shareholders.  If the process ends the way I expect it will, a private Tesla would

8    ultimately be an enormous opportunity for all of us.  Either way, the future is very
     bright and we'll keep fighting to achieve our mission.

9
     Thanks,
10   Elon

11       25.    As a result of these statements, Tesla's stock price rapidly increased, reaching an

12   intra-day high of $387.46 per share, $45.47 per share higher than the previous day's closing price,

13   before closing at $379.57 per share on August 7, 2018, a one-day increase of $37.58 per share.

14       26.    The statements referenced above were materially false and misleading because they

15   misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's

16   business and prospects:

17       (a)    Funding for the going-private transaction was not secured at the time of

18   Musk's August 7, 2018 tweets;

19       (b)    The Board was not aware of the plan to take Tesla private;

20       (c)    Advisors for such a transaction had not been retained; and

21       (d)    As a result of the foregoing, defendants' public statements were materially

22   false and misleading at all relevant times.

23       27.    On August 8, 2018, it was announced that the SEC was making inquiries regarding

24   the veracity of the tweets sent by Musk and the reason the disclosures were made via a social media

25   posting rather than a filing with the SEC.  Multiple financial news agencies reported that no

26   investment banks or technology firms they had contacted were aware of Tesla's potential going-

27   private transaction and had denied being the source of the "secure" funding that Musk had promised.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 5 -

1    28.    As a result of this news, Tesla's stock price declined $9.23 per share to close at

2 $370.34 per share on August 8, 2018.

3    29.    On August 13, 2018, Musk tweeted: "I'm excited to work with Silver Lake and

4 Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles &

5 Olson as legal advisors, on the proposal to take Tesla private."

6    30.    According to a *New York Times* article published on August 13, 2018, entitled "Tesla

7 Board Surprised by Elon Musk's Tweet on Taking Carmaker Private," "[a] person with direct

8 knowledge of the Tesla board's thinking said some members of the board had been totally blindsided

9 by Mr. Musk's decision to air his plan on Twitter."  This demonstrates that Musk's abrupt tweet had

10 not been cleared ahead of time by the Company's Board.  Additionally, the *New York Times* article

11 pointed out that "[t]he tweet did not disclose the sum he had supposedly secured, its source, or any

12 terms of the plan," and therefore Musk knew, or should have known that his tweet would drive up

13 the price of Tesla shares and manipulate the pricing of all Tesla securities based on false and

14 misleading information.

15    31.    On August 13, 2018, defendant Musk posted an "Update on Taking Tesla Private" on

16 the Company's corporate blog, which stated:

17    Update on Taking Tesla Private
      Elon Musk – August 13, 2018
18

19        As I announced last Tuesday, I'm considering taking Tesla private because I
      believe it could be good for our shareholders, enable Tesla to operate at its best, and
      advance our mission of accelerating the transition to sustainable energy.  As I
20    continue to consider this, I want to answer some of the questions that have been
      asked since last Tuesday.
21

22    **What has happened so far?**

23        On August 2nd, I notified the Tesla board that, in my personal capacity, I
      wanted to take Tesla private at $420 per share.  This was a 20% premium over the
      ~$350 then current share price (which already reflected a ~16% increase in the price
24    since just prior to announcing Q2 earnings on August 1st).  My proposal was based
      on using a structure where any existing shareholder who wished to remain as a
25    shareholder in a private Tesla could do so, with the $420 per share buyout used only
      for shareholders that preferred that option.
26

27        After an initial meeting of the board's outside directors to discuss my
      proposal (I did not participate . . .), a full board meeting was held.  During that
      meeting, I told the board about the funding discussions that had taken place (more on
28    that below) and I explained why this could be in Tesla's long-term interest.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 6 -

1

2

3

4

        At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders.  Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me. They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future.  I told the board that I would report back after I had these discussions.

5

**Why did I make a public announcement?**

6

7

8

9

10

        The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private.  However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time.  As a result, it was clear to me that the right thing to do was announce my intentions publicly.  To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**

11

12

13

14

15

        Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private.  They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil.  They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction.  Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

16

17

18

19

        Recently, after the Saudi fund bough almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting.  That meeting took place on July 31st.  During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time.  I understood from him that no other decision makers were needed and that they were eager to proceed.

20

21

        I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving.   This is why I referred to "funding secured" in the August 7th announcement.

22

23

24

25

        Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund.  He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements.

26

27

28

        Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used.  However, it would be premature to do so now.  I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.

It is also worth clarifying that most of the capital required for going private would be funded by equity rather than debt, meaning that this would not be like a standard leveraged buyout structure commonly used when companies are taken private. I do not think it would be wise to burden Tesla with significantly increased debt.

Therefore, reports that more than $70B would be needed to take Tesla private dramatically overstate the actual capital raise needed. The $420 buyout price would only be used for Tesla shareholders who do not remain with our company if it is private. My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla.

**What are the next steps?**

As mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time. I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options. Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected. If the board process results in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote.

32. On August 14, 2018, *Bloomberg* published an article, entitled "Goldman's Missing Mandate Adds to Clues Musk Tweeted Out of Turn," reporting that neither Goldman Sachs nor Silver Lake were yet working with Musk pursuant to a signed agreement or in an official capacity when Musk said on Twitter late Monday, August 13, 2018, that both firms were working with him as financial advisers.

33. Following this news, the price of Tesla stock fell $8.77 per share to close at $347.64 per share on August 14, 2018, a decline of 2.5%.

34. On August 17, 2018, *The New York Times* published an interview with Musk that revealed the stress he had been under, his use of Ambien, and the manner in which the August 7, 2018 tweet had been conceived:

Asked if the exhaustion was taking a toll on his physical health, Mr. Musk answered: "It's not been great, actually. I've had friends come by who are really concerned."

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

- 8 -

1

2

3

4

        The events set in motion by Mr. Musk's tweet have ignited a federal investigation and have angered some board members, according to people familiar with the matter.  Efforts are underway to find a No. 2 executive to help take some of the pressure off Mr. Musk, people briefed on the search said.  And some board members have expressed concern not only about Mr. Musk's workload but also about his use of Ambien, two people familiar with the board said.

\*     \*     \*

5

6

7

        In the interview, Mr. Musk provided a detailed timeline of the events leading up to the Twitter postings on Aug. 7 in which he said he was considering taking the company private at $420 a share.  He asserted that he had "funding secured" for such a deal – a transaction likely to be worth well over $10 billion.

8

9

        That morning, Mr. Musk woke up at home with his girlfriend, the musician known as Grimes, and had an early workout.  Then he got in a Tesla Model S and drove himself to the airport. En route, Mr. Musk typed his fateful message.

10

        Mr. Musk has said he saw the tweet as an attempt at transparency.  He acknowledged Thursday that no one had seen or reviewed it before he posted it.

11

\*     \*     \*

12

13

        What Mr. Musk meant by "funding secured" has become an important question. Those two words helped propel Tesla's shares higher.

14

        But that funding, it turned out, was far from secure.

15

16

17

18

19

        Mr. Musk has said he was referring to a potential investment by Saudi Arabia's government investment fund.  Mr. Musk had extensive talks with representatives of the $250 billion fund about possibly financing a transaction to take Tesla private – maybe even in a manner that would have resulted in the Saudis' owning most of the company.  One of those sessions took place on July 31 at the Tesla factory in the Bay Area, according to a person familiar with the meeting.  But the Saudi fund had not committed to provide any cash, two people briefed on the discussions said.

\*     \*     \*

20

21

22

23

        The S.E.C. investigation appears to be intensifying rapidly. Just days after the agency's request for information, Tesla's board and Mr. Musk received S.E.C. subpoenas, according to a person familiar with the matter.  Board members and Mr. Musk are preparing to meet with S.E.C. officials as soon as next week, the person said.

\*     \*     \*

24

25

        To help sleep when he is not working, Mr. Musk said he sometimes takes Ambien. "It is often a choice of no sleep or Ambien," he said.

26

27

28

        But this has worried some board members, who have noted that sometimes the drug does not put Mr. Musk to sleep but instead contributes to late-night Twitter sessions, according to a person familiar with the board's thinking.  Some board members are also aware that Mr. Musk has on occasion used recreational drugs, according to people familiar with the matter.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

35.     On this news, Tesla's stock declined $29.95 per share to close at $305.50 per share on August 17, 2018.

36.     Later developments have confirmed that funding was not secured as of August 7, 2018, contrary to Musk's tweet. On August 24, 2018, *CNBC* published an article that stated in part:

> Tesla CEO Elon Musk's hiring of Morgan Stanley this week is just a small step in his ongoing quest to take Tesla private.
>
> But it has a larger, more damning implication: he probably didn't have funding secured, even in the most loose sense of the phrase.
>
> Musk is on the verge of hiring Morgan Stanley because the bank excels in rounding up financing from a wide array of sources, according to a person familiar with the matter.  Musk has already retained Goldman Sachs to advise his attempt at taking the company private, first announced in an August 7 tweet. Morgan Stanley will be brought in the same capacity – to raise money for a potential deal.
>
> Musk wouldn't need to hire Morgan Stanley if he had secured funding at this point.  The board's special committee still hasn't retained an investment bank, and there is no indication anything will happen quickly with regard to a privatization, said two people familiar with the matter, who asked not to be named because the discussions are private.
>
> Musk said in that tweet he had "funding secured" to take Tesla private at $420 a share.  He followed that tweet up with a public statement on August 13 saying he'd met with the Saudi Arabian sovereign wealth fund several times, which prompted him to tweet that he had secured financing.  Musk is also using private equity firm Silver Lake as an adviser, which the New York Times reported could be interested in a private investment.
>
> The Saudi Public Investment Fund hasn't made a public comment supporting Musk's claim in the nearly two weeks that have followed his statement.  It's still unclear exactly how much money Musk will need to raise from outside investors – that will depend on how many existing shareholders roll over their investments into a theoretically privatized company.  Musk suggested two-thirds of investors might do so, which would result in a need for about $24 billion in outside capital at $420 per share.
>
> Musk wrote in his August 13 blog post that the managing director of the Saudi fund needed more detail before moving forward with an investment, "including the proposed nature and source of the funding to be used."  Musk acknowledged in his post he planned to speak to other investors. Morgan Stanley and Goldman will help him find them.  They have not started this task, the people said.
>
> The board will also have to vet that $420 number, which may have to rise after the special committee does its due diligence, including calling around to outside parties that may be willing to pay more.

1    37.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class

2  purchased Tesla securities at artificially inflated prices, suffering significant losses, and were

3  damaged thereby.

4                      **LOSS CAUSATION AND ECONOMIC LOSS**

5    38.    During the Class Period, as detailed herein, defendants engaged in a scheme to

6  deceive the market and a course of conduct that artificially inflated the prices of Tesla securities and

7  operated as a fraud or deceit on purchasers of Tesla securities.  As detailed above, when the truth

8  was revealed, the value of the Company's securities declined precipitously as the prior artificial

9  inflation no longer propped up the securities' prices.  The declines in Tesla's share price were the

10  direct result of the nature and extent of defendants' fraud finally being revealed to investors and the

11  market.  The timing and magnitude of the share price declines negate any inference that the losses

12  suffered by plaintiff and other members of the Class were caused by changed market conditions,

13  macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent

14  conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a

15  direct result of defendants' fraudulent scheme to artificially inflate the prices of the Company's

16  securities and the subsequent significant decline in the value of the Company's securities when

17  defendants' prior misrepresentations and other fraudulent conduct were revealed.

18    39.    At all relevant times, defendants' materially false and misleading statements or

19  omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other

20  Class members.  Those statements were materially false and misleading through their failure to

21  disclose a true and accurate picture of Tesla's business and prospects as alleged herein.  Throughout

22  the Class Period, defendants issued materially false and misleading statements and omitted material

23  facts necessary to make defendants' statements not false or misleading, causing the prices of Tesla's

24  securities to be artificially inflated.  Plaintiff and other Class members purchased Tesla securities at

25  those artificially inflated prices, causing them to suffer damages as complained of herein.

26                  **APPLICABILITY OF PRESUMPTION OF RELIANCE**

27    40.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

28  market doctrine in that, among other things:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 11 -

1          (a)      Defendants made public misrepresentations or failed to disclose material facts

2   during the Class Period;

3          (b)      The omissions and misrepresentations were material;

4          (c)      The Company's securities traded in an efficient market;

5          (d)      The misrepresentations and omissions alleged would tend to induce a

6   reasonable investor to misjudge the value of the Company's securities; and

7          (e)      Plaintiff and other members of the Class purchased Tesla securities between

8   the time defendants misrepresented or failed to disclose material facts and the time the true facts

9   were disclosed, without knowledge of the misrepresented or omitted facts.

10         41.      At all relevant times, the market for Tesla securities was efficient for the following

11  reasons, among others:

12         (a)      Tesla stock met the requirements for listing and was listed and actively traded

13  on the NASDAQ, a highly efficient market;

14         (b)      As a regulated issuer, Tesla filed periodic public reports with the SEC; and

15         (c)      Tesla regularly communicated with public investors via established market

16  communication mechanisms, including through the regular dissemination of press releases on major

17  news wire services and through other wide-ranging public disclosures, such as communications with

18  the financial press, securities analysts and other similar reporting services.

19                                          **NO SAFE HARBOR**

20         42.      Defendants' false or misleading statements during the Class Period were not forward-

21  looking statements ("FLS"), or were not identified as such by defendants, and thus did not fall within

22  any "Safe Harbor."

23         43.      Tesla's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the

24  Class Period were ineffective to shield those statements from liability.

25         44.      Defendants are also liable for any false or misleading FLS pleaded because, at the

26  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

27  authorized and/or approved by an executive officer of Tesla who knew that the FLS was false.

28  Further, none of the historic or present-tense statements made by defendants were assumptions

1 underlying or relating to any plan, projection or statement of future economic performance, as they

2 were not stated to be such assumptions underlying or relating to any projection or statement of future

3 economic performance when made.

**CLASS ACTION ALLEGATIONS**

5      45.      Plaintiff brings this action on behalf of all purchasers of Tesla securities during the

6 Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and

7 their immediate families, the officers and directors of the Company and their immediate families,

8 their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants

9 have or had a controlling interest.

10      46.      The members of the Class are so numerous that joinder of all members is

11 impracticable.  Throughout the Class Period, Tesla securities were actively traded on the NASDAQ.

12 While the exact number of Class members is unknown to plaintiff at this time and can only be

13 ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of

14 members in the proposed Class.  Record owners and other members of the Class may be identified

15 from records maintained by Tesla or its transfer agent and may be notified of the pendency of this

16 action by mail, using the form of notice similar to that customarily used in securities class actions.

17 

18 Upon information and belief, these shares are held by hundreds or thousands of individuals located

19 geographically throughout the country.  Joinder would be highly impracticable.

20      47.      Plaintiff's claims are typical of the claims of the members of the Class as all members

21 of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws

22 complained of herein.

23 

24      48.      Plaintiff will fairly and adequately protect the interests of the members of the Class

25 and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has

26 no interests antagonistic to or in conflict with those of the Class.

27 

28

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)     whether the prices of Tesla securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

51.     Plaintiff incorporates ¶¶1-50 by reference.

52.     During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

1     (b)     Made untrue statements of material fact or omitted to state material facts

2   necessary in order to make the statements made, in light of the circumstances under which they were

3   made, not misleading; or

4     (c)     Engaged in acts, practices and a course of business that operated as a fraud or

5   deceit upon plaintiff and others similarly situated in connection with their purchases of Tesla

6   securities during the Class Period.

7     54.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

8   the market, they paid artificially inflated prices for Tesla securities.  Plaintiff and the Class would

9   not have purchased Tesla securities at the prices they paid, or at all, if they had been aware that the

10   market prices had been artificially and falsely inflated by defendants' misleading statements.

11     55.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

12   other members of the Class suffered damages in connection with their purchases of Tesla securities

13   during the Class Period.

14                                     **COUNT II**

15                      **For Violation of §20(a) of the 1934 Act**
                              **Against All Defendants**
16

17     56.     Plaintiff incorporates ¶¶1-55 by reference.

18     57.     During the Class Period, defendants acted as controlling persons of Tesla within the

19   meaning of §20(a) of the 1934 Act.  By virtue of his positions and his power to control public

20   statements about Tesla, defendant Musk had the power and ability to control the actions of Tesla and

21   its employees.  Tesla controlled Musk and its other officers and employees.  By reason of such

22   conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

23                                  **PRAYER FOR RELIEF**

24   WHEREFORE, plaintiff prays for judgment as follows:

25     A.     Determining that this action is a proper class action, designating plaintiff as Lead

26   Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil

27   Procedure and plaintiff's counsel as Lead Counsel;

28     B.     Awarding plaintiff and the members of the Class damages and interest;

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 15 -

1        C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

2        D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

3   proper.

4                              **JURY DEMAND**

5        Plaintiff demands a trial by jury.

6   DATED:  August 28, 2018              ROBBINS GELLER RUDMAN
                                           & DOWD LLP
7                                        SHAWN A. WILLIAMS

8

9                                                  *s/ Shawn A. Williams*
                                             SHAWN A. WILLIAMS

10
                                         Post Montgomery Center
11                                       One Montgomery Street, Suite 1800
                                         San Francisco, CA  94104
12                                       Telephone:  415/288-4545
                                         415/288-4534 (fax)
13
                                         ROBBINS GELLER RUDMAN
14                                         & DOWD LLP
                                         DAVID C. WALTON
15                                       655 West Broadway, Suite 1900
                                         San Diego, CA  92101-8498
16                                       Telephone:  619/231-1058
                                         619/231-7423 (fax)
17
                                         JOHNSON FISTEL, LLP
18                                       FRANK J. JOHNSON
                                         655 West Broadway, Suite 1400
19                                       San Diego, CA  92101
                                         Telephone:  619/230-0063
20                                       619/255-1856 (fax)

21                                       Attorneys for Plaintiff

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        - 16 -

DocuSign Envelope ID: 91715ECA-3C69-4406-B024-13BCF0DBA2A2

**CERTIFICATION OF PLAINTIFF PURSUANT**
**TO THE FEDERAL SECURITIES LAWS**

I, Joshua Horwitz, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 8/7/18 | 20 | $382 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 8/17/18 | 20 | $310 |

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of August, 2018.

DocuSigned by:

A88C4A71FD7A417...

Joshua Horwitz